# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** *1:CR-11-201* |
| | : | |
| **v.** | : | (Judge *Conner*     ) |
| | : | |
| **EMMANUEL LOUISSAINT** | | |

**FILED**
HARRISBURG, PA

### INFORMATION

JUN 1 0 201'

### COUNT 1
### (Conspiracy to Commit Mail Fraud and Wire Fraud)

MARY E. D'ANDREA, CLERK

Per _____ Deputy Clerk

## A. Background

Beginning in or around January 2005 and continuing through December 2009, domestic and foreign based mass marketers, both known and unknown to the United States Attorney, instructed victims to send Western Union and MoneyGram money transfers to satisfy advance fee conditions associated with falsely promised lucrative financial awards and offers.  Some of the mass marketing schemes included the manufacture, distribution and negotiation of counterfeit checks.  The mass marketers used fictitious names, titles, companies, and addresses when they communicated with victims, and instructed the victims to send the Western Union and MoneyGram money transfers payable to fictitious name payees.  **EMMANUEL LOUISSAINT** trading as Hudson Food Market II and other complicit Western Union and MoneyGram Agents processed and cashed the victim money transfers in a manner which maintained the anonymity of the mass marketers, and concealed the control and ownership of the fraudulent proceeds.  **EMMANUEL LOUISSAINT** and other complicit agents kept a portion of the fraud induced proceeds as compensation for their role in the conspiracy.

As used in this Information, the term "mass marketer" or "mass marketers" refers to an individual, or group of individuals, who use one or more means of mass communication media, to include the mail, telephone and internet, to distribute fraudulent sweepstakes, loan, employment opportunity and other lucrative financial awards and offers.

The mass marketing schemes included, but were not limited to the following:

SWEEPSTAKES SCHEMES

- Advance fee sweepstakes schemes wherein purported "winners" were directed to pre-pay processing fees and taxes in order to collect their cash prizes. The Western Union and MoneyGram payees were falsely identified as representatives of public or private sweepstakes organizations or taxing authorities. As used in this Information, the term "winner" refers to an individual who received a fraudulent prize notification and counterfeit check.

LOAN SCHEMES

- Advance fee loan fraud schemes wherein purported successful loan applicants were directed to pay advance fees to purchase insurance or to place security deposits in order to receive guaranteed loan proceeds. The Western Union and MoneyGram payees were falsely identified as representatives of the purported lenders. As used in this Information, the term "borrower" refers to an individual who was falsely promised a loan.

EMPLOYMENT OPPORTUNITY SCHEMES

- Employment Opportunity schemes wherein job seekers were directed to cash checks and use the proceeds to complete purchases, Western Union and MoneyGram money transfers to evaluate retail stores, Western Union and MoneyGram. The victims, sometimes referred to as "secret shoppers", were directed to retain a portion of the cash proceeds as payment for their services. As used in this Information, the term "secret shopper" refers to an individual who was

2

recruited via the mail to cash checks and send Western Union and MoneyGram money transfers on behalf of purported quality control consultants.

## PERSON IN NEED SCHEMES

- Person in Need schemes wherein mass marketers developed an on-line relationship with intended victims or posed as a relative, typically a grandchild, in order to induce the intended victims to send  Western Union or MoneyGram  money transfers for a false need or emergency.

## INTERNET PURCHASE SCHEMES

- Internet purchase schemes wherein mass marketers posed as the sellers of large ticket items, in most instances at a lucrative price.  The mass marketers directed the purchasers to send Western Union or MoneyGram money transfers as payment for the items.  The merchandise was never delivered.

Domestic and foreign based mass marketers distributed the fraudulent prize notifications and employment opportunities accompanied by checks via Canada Post and the United States mail.  The advance fee loan fraud offers were routinely distributed via the internet.  Telemarketers falsely authenticated the prize notifications, employment opportunities, and loan offers.  Telemarketers directed the recipients to cash the checks to fund the pre-payment of fees which were reportedly a condition of prize delivery, or to complete retail purchases and send Western Union and MoneyGram money transfers in order to evaluate the respective businesses pursuant to the employment opportunity schemes.   The checks cashed by the purported "winners" and "secret shoppers", hereinafter victims, were counterfeit, and returned unpaid to the banks of first deposit. The banks of first deposit initiated collection procedures against the victims for the total value of the counterfeit checks.   The advance fee loan schemes did not ordinarily include the delivery of a check to the intended victim.  As a condition of loan issuance, loan fraud victims were instructed to use personal funds to send Western Union and MoneyGram money transfers to complete collateral and insurance payments.    The

prize notifications, employment opportunities and loan offers were fictitious and the claimed association with legitimate public and private sweepstakes or lottery organizations, customer service evaluation businesses and   lenders was false.

As used in this Information, the term "complicit agent" describes a Western Union or MoneyGram agent who permitted mass marketers to cash fraud-induced Western Union and MoneyGram money transfers payable to multiple fictitious names.   The defendant **EMMANUEL LOUISSAINT** and other "complicit agents" entered false names and identification data into the Western Union and MoneyGram computer data bases to conceal the true identity of the mass marketers from the victims, law enforcement and regulatory agencies.   The mass marketers and "complicit agents" used thousands of different payee names in order to avoid detection and the scrutiny of anti-money laundering protocols.

The defendant **EMMANUEL LOUISSAINT** trading as Hudson Food Market II and numerous Western Union and MoneyGram Agents recruited by the mass marketers and uncharged co-conspirators, known and unknown to the United States Attorney, converted the fraud induced Western Union and MoneyGram money transfers to cash or a combination of cash, bank wires and money transfers on behalf of the co-conspirator mass marketers and money launderers.   **EMMANUEL LOUISSAINT** and similarly complicit Western Union and MoneyGram Agents, known and unknown to the United States Attorney, entered false payee identification and biographical data into the Western Union and MoneyGram transactional data bases.   In so doing, the defendant **EMMANUEL LOUISSAINT**, concealed the identity of the fraudulent mass marketers and money launderers and the control and ownership of the fraudulent proceeds from

4

the victims, Western Union, MoneyGram, and United States Treasury officials and law enforcement officials.

At all times pertinent to this Indictment:

1.   Western Union and MoneyGram were publicly traded global money transfer companies.   The Western Union and MoneyGram networks consisted of over 500,000 Agents, sometimes referred to as outlets, worldwide.   Typical Western Union and MoneyGram money transfers are sent among (to and from) family members and close acquaintances.   The average dollar amount of a typical North American Western Union and MoneyGram money transfer approximates $400.   The average dollar amount of a typical fraud-induced money transfer cashed by a complicit agent pursuant to mass marketing sweepstakes and secret shopper schemes approximates $2,000.  Only a fraction, estimated between ten to twenty five percent, of the victims reported the fraud-induced money transfers to Western Union and MoneyGram.

2.   Western Union and MoneyGram money transfer senders were required to present cash and complete a handwritten application, known as a "To Send Money" (Western Union) or "Send" (MoneyGram) form at an authorized Western Union or MoneyGram Agent location..  The senders were required to list the amount of the transfers, the names of the payees (receivers), the expected payout locations, and their own names, telephone numbers and addresses on the "To Send Money" and "Send" forms.   The Western Union and MoneyGram Agents collected the money transfer amounts, plus money transfer fees from the senders, and entered the senders' biographical and identification data, along with the names of the   intended   payees   into   the   Western   Union   and   MoneyGram transactional data bases.   Western Union assigned 10 digit Money

5

Transfer Control Numbers (MTCNs) and MoneyGram assigned 8 digit Reference Numbers to the transactions.

3.      Western Union and MoneyGram payees were required to physically enter authorized Western Union and MoneyGram Agent locations (outlets) and complete  handwritten applications, known as a "To Receive Money" (Western Union) and "Receive" (MoneyGram) forms.  The payees were directed to list their own addresses and telephone numbers, and the name, city and state of the senders and the expected money transfer amounts on the "To Receive Money" and "Receive" forms.  It was optional for the payees to list the 10 digit MTCN and 8 digit Reference Numbers. The payees presented the completed "To Receive Money" and "Receive" forms to the Western Union and MoneyGram Agents.  The Western Union and MoneyGram Agents were then required to query the Western Union or MoneyGram transactional data bases to determine whether the money transfers had been sent by the senders identified by the payees.  For all money transfers in an amount equal to or greater than $1,000 (Western Union) or $900 (MoneyGram) the payees were required to present valid identification documents for examination by the Western Union and MoneyGram Agents.  The Western Union and MoneyGram Agents were required to enter the payee names, addresses, telephone numbers, and identification document serial numbers into the Western Union and MoneyGram transactional data bases.

4.      Regardless of the expected city and state listed by Western Union money transfers senders, the money transfers pertinent to this Information were converted to cash and corresponding money transfers in the Greater Newark, NJ Area by the defendant **EMMANUEL LOUISSAINT**.   A substantial portion of those monies were re-wired by **LOUISSAINT**, and others, to Canada and West Africa in the form of money transfers. **EMMANUEL LOUISSAINT** and a co-conspirator shared an approximate 10% cut of the fraud induced money transfers for their role in the

6

conspiracy.

5.   The defendant **EMMANUEL LOUISSAINT** operated a Western Union outlet named Hudson Food Market II in the Greater Newark, New Jersey Area from in or about January 2005 through in or about December 2009. In or about December 2009, Western Union terminated **LOUISSAINT's** contract to process Western Union money transfers due, in part, to **LOUISSAINT's** apparent complicity in mass marketing fraud and money laundering activity.   During the period January 2005 through December 2009, Western Union senders reported that 256 money transfers totaling $765,467 paid at Hudson Food Market II were induced by fraudulent mass marketing activity.

## B.  The Conspiracy and Its Objects

6.       Beginning in approximately January 2005 and continuing through approximately December 2009, in the Middle District of Pennsylvania and elsewhere, the defendant **EMMANUEL LOUISSAINT** and various co-conspirators, both known and unknown to the United States Attorney, did knowingly and willfully conspire and agree together and with each other, to commit various offenses against the United States; that is:

a)  To devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises through the use of the United States mail and private couriers, in violation of Title 18, United States Code, Section 1341, Mail Fraud, and;

b)  To devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire, radio and television communication in interstate and foreign commerce, any writings,

signals, pictures and sounds in violation of Title 18, United States Code, Section 1343, Wire Fraud.

## C. Manner and Means of the Conspiracy and Scheme and Artifice to Defraud

7.     It was part of the conspiracy and scheme and artifice to defraud that the defendant **EMMANUEL LOUISSAINT** and various co-conspirators, both known and unknown to the United States Attorney, agreed to obtain money and property; to wit, in excess of $765,467 from hundreds of victims through a scheme in which the co-conspirator mass marketers falsely promised lucrative financial awards and other items of value.  It was also part of the conspiracy and scheme and artifice to defraud that the victims were told that in order to receive the cash prizes, compensation, loans or various other financial awards they were required to make advance payments, which the co-conspirators characterized as "taxes", "Customs' duties", "insurance", "security deposits" or "processing fees" dependent on the nature of the underlying scheme.  It was also part of the conspiracy and scheme and artifice to defraud that in some instances the co-conspirators delivered counterfeit checks payable to the victims to fund the advance payments.  The co-conspirators directed the victims to cash the checks and wire the cash proceeds via Western Union and MoneyGram to fictitious name payees.  The mass marketers falsely represented to the victims that the Western Union and MoneyGram payees were bona-fide representatives of a business enterprise or governmental agency dependent on the nature of the underlying scheme. The defendant **EMMANUEL LOUISSAINT,** and other co-conspirator Western Union and MoneyGram Agents, known and unknown to the United States Attorney, permitted the uncharged co-conspirator mass marketers to cash money transfers in multiple fictitious names, and simultaneously entered false addresses, telephone numbers and

8

identification document serial numbers into the Western Union and MoneyGram transactional data-bases.   In so doing **EMMANUEL LOUISSAINT** and the co-conspirators concealed the true identity of the co-conspirator mass marketers, and eventual ownership and control of the fraudulent proceeds.   After the purported victims completed the Western Union and MoneyGram money transfers, the co-conspirators failed to distribute any of the promised cash prizes, compensation, loans or financial awards, and failed to refund the purported pre-paid "taxes", "Customs' duties", "processing fees", "collateral payments", "security deposits" and "insurance premiums".  The counterfeit checks deposited and cashed by the victims were returned unpaid, and the victims were responsible to reimburse the banks or entities which cashed the checks. In order to effect this conspiracy and scheme and artifice to defraud, the defendant **EMMANUEL LOUISSAINT** and the various co-conspirators, both known and unknown to the United States Attorney, aided and abetted each other and with the knowledge and consent of all of the parties, engaged in the following fraudulent conduct:

## D.  Overt Acts

The preceding paragraphs of this Information are incorporated into this section as if fully set forth herein.

8. On various dates B. H., a resident of Lebanon County, received fraudulent sweepstakes notifications via the United States Mail.

9.    On or about June 25, 2007, an unidentified co-conspirator telemarketer identifying himself as a sweepstakes official, told B. H. that B. H. had won a large cash sweepstakes.  B. H. was told that in order to claim that prize, B. H. first had to pre-pay taxes and other processing fees.

9

10.  The purported sweepstakes official told B. H. that the advance payments had to be made via a $2,900 Western Union money transfer payable to Darry King.

11.  On or about June 26, 2007, B. H. sent a $2,900 money transfer payable to Darry King from Lebanon County, Pennsylvania.

12.  On or about June 26, 2007, B. H.'s $2,900 money transfer payable to Darry King was processed at Hudson Food Market II in New Jersey.  The payee address and identification data entered for the purported payee Darry King at Hudson Food Market II were invalid.

In violation of Title 18, United States Code, Section 1349 and Section 2.


*Peter J. Smith*

PETER J. SMITH   *by CRG*

United States Attorney


Dated:  6-6-2011